IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE DOE<br>1122 Spruce Street, Apt. A<br>Philadelphia, PA 19107<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>MERCY CATHOLIC MEDICAL CENTER<br>1500 Lansdowne Avenue<br>Darby, PA 19023<br><br>and<br><br>MERCY HEALTH SYSTEM<br>One West Elm Street<br>Suite 100<br>Conshohocken, PA 19428<br><br>　　　　Defendants. | Civil Action No:<br><br><br>**JURY TRIAL DEMANDED** |

## CIVIL ACTION COMPLAINT

Plaintiff Jane Doe ("Plaintiff") hereby complains as follows against Defendant Mercy Catholic Medical Center and/or Defendant Mercy Health System ("Defendant Mercy").

## INTRODUCTION

1. Plaintiff has initiated the instant action to redress violations by Defendant Mercy of Title IX of the Education Amendments Act of 1972 ("Title IX"). In essence, Plaintiff was subjected to a sexually hostile work environment and retaliated against for complaining of same; this retaliation culminated in the termination of her residency with Defendant Mercy.

## JURISDICTION AND VENUE

2. This Court has original subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 because the claims herein arise under laws of the United States and seeks redress for violations of a federal law.

3. This Court may also maintain supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) and Rule 18(a) of the Federal Rules of Civil Procedure, because they are sufficiently related to the claim(s) within the Court's original jurisdiction that they form part of the same case or controversy.

4. This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice.

5. Pursuant to 28 U.S.C. § 1391, venue is properly laid in this judicial district because all off the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

**PARTIES**

6. The foregoing paragraphs are incorporated herein as if set forth in full.

7. Plaintiff is an adult individual and citizen of Pennsylvania living at 1122 Spruce Street, Apt. A, Philadelphia, PA 19107. "Jane Doe" is a pseudonym to avoid public disclosure of the sexual harassment she suffered and the psychiatric treatment she received as part of her corrective plan as outlined below.[1]

8. Defendant Mercy Health System ("Defendant MHS") is a not-for-profit corporation which operates health care facilities in Southeastern Pennsylvania and which is headquartered at the address set forth in the caption.

---

[1] Plaintiff's name will be provided to Defendant and the Court in a non-public filing.

9. Defendant Mercy Catholic Medical Center ("Defendant MCMC") is a not-for-profit hospital system which operates multiple facilities as set forth in the caption and which is headquartered in Darby, PA. On information and belief, Defendant MCMC is a part of Defendant Mercy Mercy Health with no separate corporate identity from Defendant MHS, and the two defendants are referred to herein collectively as "Defendant Mercy."

10. At all times relevant herein, Defendant Mercy acted through its agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## FACTUAL BACKGROUND

11. The foregoing paragraphs are incorporated herein as if set forth in full.

12. Plaintiff is an adult female.

13. Plaintiff received her initial medical education in Turkey at Hacettepe University Medical School, receiving her M.D. in 1996.

14. After receiving her M.D., Plaintiff completed a residency in neurosurgery at Hacettepe University in 2003.

15. Plaintiff began a fellowship in spinal surgery at Johns Hopkins University in November 2006 and completed this fellowship in June 2008.

16. Plaintiff completed an internship in at New York University Langone Medical Center in June 2009.

17. Plaintiff then attended two years of a residency at Johns Hopkins Hospital, the Division of Nuclear Medicine, from July 2009 until July 2011.

18. Plaintiff began a residency with Defendant Mercy in the Department of Radiology in July 2011.

19. Dr. James Roe[2] was the Program Director of Defendant Mercy's residency program during Plaintiff's residency.

20. When Plaintiff began her residency, she was married, but maintaining a separate household in the Philadelphia area while her husband remained in the Baltimore area.

21. Shortly after Plaintiff's residency began, Roe initiated a personal relationship with Plaintiff that involved discussions of Roe's private life, and relatives, and hobbies.

22. Roe also asked about and learned about Plaintiff's marriage and her circumstances of living away from her husband during the Mercy residency.

23. During this period, Plaintiff also noticed Roe on many occasions looking at her breasts and private parts through her clothes.

24. On one occasion, within about a few months of beginning her residency, Plaintiff and Roe were in a reading room sitting next to each and reviewing radiology reports on a computer terminal. Plaintiff observed Roe looking at her breasts, and then observed through Roe's clothes that he was aroused. Plaintiff was embarrassed and excused herself from the room for a short period before returning.

25. On another occasion, Plaintiff was speaking with another physician, Dr. Mackey, about a study being conducted, when Roe approached to join the conversation. During this conversation, Roe repeatedly gazed at Plaintiff's breasts.

26. Plaintiff further noticed that Roe would find opportunities to see her and speak with her more than would otherwise be expected.

---

[2] Roe, Plaintiff's alleged harasser, name has also been replaced by a pseudonym to preserve Mr. Roe's privacy interest, should he choose to assert one. His name will be provided to the Defendant and the Court in a non-public filing.

27. During the course of her residency, Plaintiff observed several other occasions in which the two of them were alone in the reading room and in which Roe was visibly aroused through his pants.

28. From the conversations that she had with Roe, Plaintiff reasonably concluded that Roe was sexually attracted to Plaintiff and wished to pursue a romantic relationship with her, despite the fact that both Plaintiff and Roe were married to other people.

29. Within approximately three months of Plaintiff beginning her residency program, Plaintiff sent Roe an email expressing concern that other individuals were aware of Roe's romantic interest in Plaintiff.

30. After Roe received this communication, he approached Plaintiff and asked her if she had sent that email or whether someone else had gained access to her email system. Plaintiff told him that she had sent the email, and wanted their relationship to remain professional.

31. After this conversation, Roe continued behaving in a manner that made Plaintiff believe he was romantically and/or sexually interested in her.

32. Plaintiff believed that the other residents and the faculty were aware of Roe's interest in Plaintiff and Plaintiff was uncomfortable about this.

33. Plaintiff was scheduled through Johns Hopkins to give an oral presentation at the RSNA Conference in Chicago in November 2011. Roe was also attending that same conference. Roe told Plaintiff that he wanted to see her when they were both in Chicago.

34. Plaintiff was concerned about Roe's apparent romantic and/or sexual interest in her given that she was a resident and he was the Program Director, and hoped that at a personal meeting in Chicago, she would be able to have a frank conversation with him about his interest in her. Specifically, she intended to "let him down easy" – i.e., tell him that her lack of interest

was because she was in the residency program, not that she was unattracted to him. Her hope was that this rejection would be flattering and therefore minimize the chance that Roe would be hurt and would retaliate against her.

35. Once in Chicago, Plaintiff reached out to Roe and sent him a telephone text message asked if he wanted to meet her. When Roe did not respond, Plaintiff, in an attempt to clear the air, send him additional text messages relating that she did not want to be in a compromising position with him and that she did not want to pursue a romantic relationship with him during the residency.

36. Upon returning from Chicago, Roe reported these text messages to Human Resources, claiming that Plaintiff was sending these text messages in order to make it appear as if there was a relationship between them.

37. In response, Human Resources met with Plaintiff, at which point Plaintiff explained the unwelcome sexual attention she believed she was receiving from Roe. Plaintiff further explained that Plaintiff had sent the text messages to Roe in an effort to get him to stop paying her the unwelcome sexual attention.

38. Human Resources asked Plaintiff if Roe had ever touched Plaintiff and Plaintiff related how Roe had touched Plaintiff's hand in the Reading Room.

39. Plaintiff told Human Resources that she believed that Roe's unwelcome sexual attention was negatively affecting her training.

40. On the following day, Plaintiff met with Human Resources again and Human Resources referred Plaintiff to a psychologist. Plaintiff asked if going to the psychologist was mandatory; Human Resources said that it was not, that they would get a report as to whether Plaintiff went, but if Plaintiff chose not to go, no negative effect would be taken.

41. Nevertheless, Plaintiff believed that in response to her complaint about Roe, Human Resources was directing her to go see a psychologist and it would be held against her if she did not go. Plaintiff went to the psychologist for three sessions, and told the psychologist about the unwanted sexual attention she was receiving from Roe.

42. Human Resources told Plaintiff nothing else about the results of any investigation into Plaintiff's complaints.

43. Subsequent to this, Roe's supervision and training of Plaintiff appears to be limited for a period of time; specifically, Roe was no longer scheduled to supervise Plaintiff.

44. However, within days after Plaintiff met with HR, Roe approached Plaintiff and apologized for giving the emails for giving to HR and explained that he did it because he was concerned that he would be reprimanded for having an inappropriate relationship with Plaintiff.

45. After this, on information and belief, Roe directed other faculty members to give Plaintiff special scrutiny because of the complaints she had made to him and to Human Resources.

46. Subsequent to Plaintiff's meeting with HR, Plaintiff received significantly less training and interaction from two male members of the faculty who were close with Roe, Dr. Mackey and Dr. Chan.

47. Roe continued to behave inappropriately with Plaintiff; for instance, in 2012, Plaintiff asked to leave early to meet with her husband, at which point Roe became unreasonably angry and jealous.

48. In May 2012, prior to a graduation party, Roe met with Plaintiff and told Plaintiff that his wife had suspicions he was having an affair with someone at the hospital, and Plaintiff should stay away from him at the party.

49. In Fall 2012, Plaintiff began the process of getting a divorce and informed Dr. Chan. Plaintiff asked Chan to keep the matter confidential, but Chan told Plaintiff that he intended to inform Roe.

50. Within a few weeks, Roe approached Plaintiff and told Plaintiff that he was getting a divorce as well. Roe also told Plaintiff that he wanted to be in a relationship with her.

51. During this period, after Plaintiff began the divorce process, Roe intensified his interest in her; during conversations, Roe suggested that they go shooting together and that they travel together. Roe also discussed being in a relationship with her after the residency program.

52. In December 2012, Roe told Plaintiff that he was uncomfortable with her going to dinner as part of her interview process for a post-residency fellowship at Johns Hopkins.

53. In or around December 2012, Roe complained to Plaintiff that she was rejecting his advances more; Plaintiff explained that she simply did not have time for or interest in any relationship at that point.

54. Roe also expressed unhappiness with the idea of Plaintiff leaving Philadelphia and returning to Baltimore to go to the Johns Hopkins fellowship.

55. During this same period, Plaintiff asked Roe and Chan to provide her with letters of recommendation for her application to the Johns Hopkins fellowship program.

56. Roe and Chan provided short, cursory, and perfunctory letters of recommendation.

57. When the director of the Johns Hopkins fellowship program called Roe for clarification, Roe told the director that Plaintiff was a poor candidate.

58. Subsequently the director of the Johns Hopkins fellowship program called Plaintiff to let her know that Roe had given her a poor recommendation.

59. After this, Plaintiff called Roe at the hospital and asked him why she had been given such a poor recommendation.

60. Roe told Plaintiff that he did it to teach her a lesson, and then hung up on her.

61. In response to Plaintiff's complaints about Roe's treatment of her, Roe reported Plaintiff to the Vice President of Defendant Mercy, Dr. Arnold Eiser.

62. Plaintiff was asked to meet with Roe, Eiser, Chan, and Pam Fierro. In this meeting, Plaintiff complained about the manner in which Roe was treating her and that she believed she was not getting the training she needed because of Roe's attitude towards her.

63. Plaintiff reminded Fierro and Eiser that Plaintiff had not been scheduled with her since her complaint to HR, and that the residency program was aware of this issue and her underlying complaint about Roe. The participants than asked Plaintiff to wait outside.

64. Eiser then took Plaintiff to see a psychiatrist at Defendant Mercy.

65. During the walk to the psychiatrist, Eiser told Plaintiff that they had received Plaintiff's scores for her second in service examination, and the results were poor, and that Plaintiff needed to address this. However, at a later date, Plaintiff learned that Eiser's comments were false, and that her second year in service examination scores were actually in the 70th percentile.

66. Plaintiff spoke with the psychiatrist about Roe's romantic interest in her and his romantic overtures.

67. The following day, Defendant Mercy instructed Plaintiff that if she wished to remain in the residency, she had to sign a letter of acknowledgment and be placed on a corrective plan.

9

68. Plaintiff did not wish to sign the letter and be placed on the corrective plan, but ultimately did so in order to continue her residency.

69. Contrary to Eiser's comments to her on the way to the psychiatrist, Plaintiff did very well and demonstrated great improvement on her second year (2012-2013) in-service examinations, but no one at the residency program ever met with her to deliver her results.

70. After Plaintiff learned of her results on her second in-service examinations, she went to Roe and asked Roe if he would communicate with the program director at Johns Hopkins to let him know about her improvement. Roe told Plaintiff that he would not do so.

71. In the early spring of 2013, Roe increased his harassment of Plaintiff by scheduling more sessions with Plaintiff.

72. In spring 2013, Plaintiff and Roe were in the Reading Room reviewing radiology reports when Plaintiff was operating a computer mouse with her right hand and Roe was sitting to her left. Roe then reached his right arm across Plaintiff's chest and placed his hand over Plaintiff's and moved her hand and the computer mouse. While doing this, Roe's arm was pressed against Plaintiff's breasts. Plaintiff pushed herself backwards and stood up, and told Roe that she wanted their relationship to remain professional.

73. On another occasion, an oncologist/hematologist in the hospital unaffiliated with the residency program asked Roe if Plaintiff was single; Roe responded by becoming very jealous and telling Plaintiff she should not date the cardiologist.

74. In early April 2013, one of the other residents asked Plaintiff to assist on a research paper the other resident was writing with Roe. For the paper, Plaintiff read the relevant studies and met with the resident to give feedback and advice and planned to continue to contribute as needed.

75. Nevertheless, when Roe learned that Plaintiff had been added as an author to the paper, he instructed the other resident to remove Plaintiff.

76. The other resident than told Plaintiff that Roe had order Plaintiff's removal as an author.

77. Plaintiff went to Roe to complain as to his continued unfair treatment.

78. Roe then insisted that Plaintiff was acting unprofessional and ordered Plaintiff to another meeting with the Vice President Eiser.

79. Plaintiff met with the Eiser, Roe and Pam Fierro again. Eiser asked Plaintiff if she had contributed to the paper, and Plaintiff explained her contributions. Eiser told Plaintiff that the other residents "loved Roe," to which Plaintiff explained that Roe was torturing her due to his romantic intentions. She further told Eiser that the information provided to him about her results on the second in-service examination had been false, that she had in fact done well, and that Roe had given Eiser false information about her performance on the in-service examination.

80. Plaintiff further explained that the issue went beyond the authorship issue but extended to Roe's entire retaliatory behavior over the past year, especially the negative recommendation he provided to Johns Hopkins. Eiser then directed Plaintiff to apologize to Roe. Plaintiff did so, but told the assembled that she did not want to continue to be singled out by Roe for his "special attention."

81. Roe responded by stating that he would not accept Plaintiff's apology, because it was not "sincere."

82. Eiser then suggested Plaintiff receive another psychiatric consultation and informed Plaintiff she was suspended.

83. On April 19, 2013, Defendant Mercy informed Plaintiff that it intended to terminate Plaintiff's residency, while giving her the option to appeal that decision.

84. Plaintiff appealed the termination decision, and was given a hearing on or around April 24, 2013.

85. At the hearing, the committee members heard about Plaintiff's allegations that Roe had romantic and/or sexual interest in her and it was her rejection of this that had motivated Roe's harassment and retaliation against her.

86. After the hearing, on April 24, 2013, Plaintiff was informed that the committee intended to uphold the decision to terminate, but that Plaintiff had five days to file a further appeal if she so chose.

87. Plaintiff resigned from the residency program prior to the expiration of her right to appeal, and her resignation was accepted by Defendant Mercy.

88. After resigning, Plaintiff tried unsuccessfully to apply to another residency program so that she could finish her medical education.

89. To date, Plaintiff has not been accepted to another residency program because of the manner in which her residency with Defendant Mercy ended.

90. Defendants' actions have impaired Plaintiff's ability to advance her career as a physician and her ability to get fully licensed.

91. For the aforementioned reasons, Plaintiff has suffered damages.

### COUNT I
### Violation of Title IX of the Education Amendments Act of 1972
### (Sexual Harassment and hostile educational environment)

92. The foregoing paragraphs are incorporated herein as if set forth in full.

93. Defendant Mercy operates a medical residency program that receives federal financial assistance from the Medicare program.

94. Plaintiff was a participant in Defendant Mercy's medical residency program.

95. Plaintiff was consistently subjected to pervasive and severe sexual harassment during her residency with Defendant Mercy that was both offensive and unwelcome.

96. This harassment included Defendant Roe's repeated romantic and sexual advances, his unwelcome touching of Plaintiff, and his retaliatory behavior when his overtures were rebuffed.

97. Defendant Mercy had repeated notice of the sexual harassment because Plaintiff complained of same to Human Resources in the winter of 2012, and Plaintiffs complaints were brought up again in the hearing related to her potential termination from the program in or around April 24, 2013.

98. Defendant Mercy failed to remedy the sexually hostile educational environment to which Plaintiff was exposed even after having notice of the sexual harassment which was occurring in its workplace.

99. Defendant Mercy's failure to stop or remedy the sexual harassment and sexually hostile educational environment was deliberately indifferent to Plaintiff's rights.

100. Any reasonable person would have felt that he or she was being subjected to a sexually hostile educational environment due to Defendant's conduct in failing to effectively remedy the pervasive and severe sexual harassment of which Plaintiff was exposed.

101. These actions constitute sexual harassment against Plaintiff under Title IX of the Education Amendments Act of 1972.

**COUNT II**
**Violation of Title IX of the Education Amendments Act of 1972**

**(Retaliation)**

102. The foregoing paragraphs are incorporated herein as if set forth in full.

103. Plaintiff complained about Roe's unwelcome sexual and/or romantic interest in her to Defendant's HR department in or around winter 2012.

104. After this, Plaintiff continued to complain to Roe directly that his sexual and/or romantic interest in her was unprofessional and unwelcome.

105. In or around February 2013, Plaintiff complained that Roe gave her a negative review because Roe was retaliating against her.

106. In or around April 2013, Plaintiff complained that Roe was retaliating against her by removing her name from a research project she had contributed to.

107. On April 19, Defendant Mercy decided to terminate Plaintiff's residency because of her complaints about Roe.

108. Defendant Mercy knew that Plaintiff had complained that Roe's retaliation was motivated by Plaintiff's rejection of his sexual and romantic intentions.

109. Defendant Mercy decided to terminate in retaliation for Plaintiff making complaints about Defendant Roe's sexual/romantic advances and his subsequent retaliatory behavior.

110. These actions constitute gender discrimination/retaliation against Plaintiff under Title IX of the Education Amendments Act of 1972.

## COUNT III
## Violation of Title IX of the Education Amendments Act of 1972
**(Quid Pro Quo Sexual Harassment)**

111. The foregoing paragraphs are incorporated herein as if set forth in full.

112. Defendant Roe was the Program Director of the Medical Residency program and had significant (if not controlling) input on Plaintiff's success as a medical resident.

113. Defendant Roe's advances wanted to have a sexual and romantic relationship with Plaintiff during Plaintiff's residency.

114. Plaintiff repeatedly rejected Defendant Roe's advances.

115. Defendant Roe engaged in a series of acts designed to end Plaintiff's residency because of Plaintiff's rejection of his advances.

116. Defendant Roe acted within the scope of his educational duties in retaliating against Plaintiff.

117. Defendant Roe made a complaint against Plaintiff that lead directly to the decision to terminate Plaintiff from the residency program.

118. Defendant Roe recommended that Plaintiff be removed from the residency program, and provided misleading testimony against Plaintiff in order to do so.

119. Defendant Mercy and its review committee acted as a cat's paw and rubber stamp for Defendant Roe's decision to remove Plaintiff from Defendant Mercy's residency program.

120. These actions constitute quid pro quo sexual harassment against Plaintiff under Title IX of the Education Amendments Act of 1972.

## COUNT IV
### Intentional Infliction of Emotional Distress
**(Pennsylvania common law)**
**(Respondeat Superior)**

121. The foregoing paragraphs are incorporated herein as if set forth in full.

122. Roe's actions in repeatedly subjecting Plaintiff to unwanted sexual and romantic interest and advances was extreme and outrageous conduct, retaliating against Plaintiff by writing her negative recommendations and by removing her from a research project, and then

15

having her investigated and recommending her termination constitutes extreme and outrageous conduct.

123. Plaintiff suffered severe emotional distress as a result of Roe's actions.

124. Roe performed his actions within the scope of his employment as the Program Director of Defendant Mercy's residency program.

125. Roe's actions constitute tortious intentional infliction of emotional distress under Pennsylvania common law.

126. Defendant Mercy is liable for the tortious intentional infliction of emotional distress committed by Roe against Plaintiff because it employed Roe as the Program Director of its residency program.

## COUNT V
### Negligent Supervision
**(Pennsylvania common law)**

127. The foregoing paragraphs are incorporated herein as if set forth in full.

128. Defendant Mercy failed to exercise ordinary care in preventing Roe's intentional harassment and retaliation against Plaintiff.

129. Roe's intentional harassment and retaliation against Plaintiff occurred on Defendant Mercy's premises.

130. Defendant Mercy was on notice of the need to control Roe because of Plaintiff's repeated complaints to Defendant Mercy about his treatment of her.

131. Plaintiff has suffered damages as a result of Defendant's actions and/or lack of actions in supervising Roe.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

i. Defendant is to be prohibited from continuing to maintain its illegal policy, practice, or custom of harassing, discriminating, and retaliating against employees and is to be ordered to promulgate an effective policy against such unlawful activities and to adhere thereto;

ii. Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions.

iii. Plaintiff is to be awarded punitive and/or liquidated damages (in accordance with the statutes she is suing under), as permitted by applicable law, to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

iv. Plaintiff is to be accorded damages for emotional distress and/or pain and suffering and any and all other equitable and legal relief as the Court deems just, proper, and appropriate;

v. Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable law;

vi. Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable law.

    Respectfully Submitted,

    /s/ Joshua S. Boyette
    Joshua S. Boyette, Esq.
    Richard S. Swartz, Esq.
    **SWARTZ SWIDLER, LLC**
    1101 Kings Hwy. N., Suite 402
    Cherry Hill, NJ 08032
    Phone: (856) 685-7420
    Fax: (856) 685-7417
    Attorney for Plaintiff

Date:  April 20, 2015