**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| JANE DOE | CIVIL ACTION |
|---|---|
| v. | NO. 15-2085 |
| MERCY CATHOLIC MEDICAL CENTER | |

Baylson, J.                                                                                   July 17, 2019

<u>**MEMORANDUM RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

In this case, we must determine whether genuine disputes of material fact preclude summary judgment on behalf of Defendant Mercy Catholic Medical Center. Plaintiff Jane Doe, a former medical resident in Defendant's radiology program, initiated this suit alleging that Defendant violated Title IX of the Education Amendments Act of 1972 ("Title IX") by subjecting Plaintiff to *quid pro quo* sexual harassment and retaliating against Plaintiff when she complained about that harassment, including by terminating her residency.

For reasons discussed below, summary judgment for Defendant is **GRANTED**.

## I.      PROCEDURAL BACKGROUND

Plaintiff commenced this action on April 20, 2015. (ECF 1). The complaint was amended three times, (ECF 2, 16, 28), and the Third Amended Complaint, (ECF 28, "TAC"), asserted the following causes of action:

| COUNT I: | Sexual Harassment and Hostile Educational Environment in Violation of Title IX |
|---|---|
| COUNT II: | Retaliation in Violation of Title IX |
| COUNT III: | *Quid Pro Quo* Sexual Harassment in Violation of Title IX |
| COUNTS IV–VI: | Breach of Contract in Violation of Pennsylvania law |

1

Defendant moved to dismiss on October 29, 2015, (ECF 32), and the Court then dismissed the TAC in its entirety on January 26, 2016. (ECF 44, 45). Defendant appealed that decision to the Third Circuit Court of Appeals on February 3, 2016, (ECF 46), and the Third Circuit affirmed in part, reversed in part, and remanded the case for further proceedings on March 7, 2017. See Doe v. Mercy Catholic Med. Ctr., 850 F.3d 545 (3d Cir. 2017).

The Court then signed a stipulation by the parties withdrawing Plaintiff's state law claims without prejudice. (ECF 52). Pursuant to the Third Circuit's Opinion and that stipulation by the parties, the only causes of action that remain viable at this stage of the litigation are Counts II and III.[1]

Defendant filed an Answer with Affirmative Defenses on April 11, 2018, (ECF 64), and, after discovery, filed its Motion for Summary Judgment on February 28, 2019. (ECF 100, "Motion" or "Mot."). The Motion included Defendant's Statement of Undisputed Material Facts. (ECF 100-1, "SUMF"). Plaintiff responded on March 22, 2019, (ECF 110), but failed to comply with the requirements of Federal Rule of Civil Procedure 56 and this Court's practice rules. Pursuant to an Order by the Court, Plaintiff filed her compliant Opposition on April 11, 2019. (ECF 116, "Opposition"). The Opposition included an unsworn Declaration of Jane Doe, (ECF 116-1), Plaintiff's own Statement of Undisputed Material Facts (ECF 116-2, "Pl.'s SUMF"), and Plaintiff's Response to Defendant's Statement of Undisputed Material Facts (ECF 116-3, "Resp. to SUMF"). Defendant replied on April 18, 2019 (ECF 118), and also filed a Response to Plaintiff's Statement of Undisputed Material Facts (ECF 119, "Resp. to Pl.'s SUMF"). Plaintiff then filed a Sur-Reply with leave of Court on April 29, 2019. (ECF 124, "Sur-Reply"). Plaintiff

---

[1]     Plaintiff filed a Motion to Amend/Correct the TAC on January 4, 2019, (ECF 93), which the Court denied on June 24, 2019. (ECF 129).

also filed a second, unsigned version of her declaration, which included citations to the record or Defendant's alleged concessions for each statement made. (ECF 124-1). There were some differences between the substance of the two versions of Plaintiff's declaration. (Compare ECF 116-1 ¶¶ 79–106, with ECF 124-1 ¶¶ 79–102). Defendant moved for leave to file a Sur-Sur-Reply on May 3, 2019. (ECF 125). The Court has denied that request.

The Court held oral argument on the Motion on June 26, 2019. At oral argument, Plaintiff was unable to identify any precedential case law allowing this Court to consider an unsworn declaration as part of the factual record on summary judgment. See United States ex rel. Doe v. Heart Solution, PC, 923 F.3d 308, 315 (3d Cir. 2019) (concluding that a party's statement that was both unsworn and not given under penalty of perjury was "insufficient to create an issue of fact on summary judgment"). Plaintiff also discovered at oral argument that several documents she relied on in her Response to Defendant's Statement of Undisputed Material Facts were never entered into the record before this Court. Although the Court agreed with Defendant that Plaintiff had several opportunities to submit these documents while briefing her Opposition to Defendant's Motion, the Court nonetheless deemed their omission to be a clerical error and allowed Plaintiff to submit them into the record at that time. The documents that Plaintiff submitted bore the Bates numbers MCMC 247, 248, 252, 253, and 254.

Following oral argument, Plaintiff moved for leave to correct her declaration to include the language required by 28 U.S.C. § 1746 that her statements were made "under penalty of perjury." (ECF 131 at Ex. A, "Declaration"). The Declaration is otherwise identical to the version Plaintiff initially filed with her Opposition, (see ECF 116-1), with the exception that it is unsigned. Defendant opposed that motion on July 2, 2019, (ECF 133), and Plaintiff replied in support on July 8, 2019. (ECF 134). Despite Plaintiff's repeated and inexcusable failure to comply with

Federal Rule of Civil Procedure 56, we have allowed Plaintiff to amend her Declaration to include the statutorily-required language. Because Plaintiff has now filed three versions of her Declaration, the references in this Memorandum Opinion to Plaintiff's Declaration refer to the most recently-filed Declaration, (ECF 131 at Ex. A), which includes the language required by 28 U.S.C. § 1746.[2]

## II.    UNDISPUTED FACTS

The following is a fair account of the factual assertions at issue in this case, as taken from both parties' Statements of Fact and not genuinely disputed.[3]

---

[2]    As already noted, the Declaration attached as Exhibit A to Plaintiff's motion is unsigned. Plaintiff's proposed order requests five (5) days to file an "executed" copy on the docket. The Court proceeds with the analysis below assuming Plaintiff would have signed and filed the Declaration in that time period, and that the filed Declaration would be otherwise identical to the version submitted as Exhibit A to her motion. Because of the final disposition of this Motion, Plaintiff need not actually file a signed version of the Declaration attached as Exhibit A.

[3]    The Court notes that many of Plaintiff's denials to Defendant's proffered Statement of Undisputed Material Facts include no record citations. To the extent Defendant's statements are supported by record evidence, the Court has not considered unsupported denials by Plaintiff. See Fed. R. Civ. P. 56(c), (e).

Plaintiff also submitted her Declaration in support of her Opposition to the Motion. (See 131 at Ex. A, see also ECF 116-1). Defendant characterizes the document as a "sham declaration" and urges the Court to disregard it. Many of the statements in Plaintiff's Declaration contradict her deposition testimony, are otherwise belied by the evidentiary record, or are premised on hearsay or evidence about which Plaintiff could not have personal knowledge. Plaintiff offers no explanation for the contradictions, nor does she point to independent evidence in the record to support much of her late-offered version of events. The Court will not credit the statements that fall into those categories or any of Plaintiff's proffered "undisputed" facts that rely on them. See Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004) (permitting a trial court to "disregard[] an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony"); J.R. v. Lehigh County, 534 F. App'x 104 (3d Cir. 2013) (explaining that a court must consider the following factors when analyzing an apparently contradictory declaration: the timing of the declaration, whether there is a plausible explanation for the contradictory statements, and whether there is independent evidence in the record supporting the declaration); Escanio v. UPS, 538 F. App'x 195, 201 (3d Cir. 2013) (holding that evidence that "consists entirely of inadmissible hearsay . . . cannot be relied upon to defend against a motion for summary judgment").

## A.    Background on Plaintiff and Roe

Plaintiff commenced her medical residency with Defendant's Diagnostic Radiology Residency Program on July 15, 2011.  (SUMF ¶ 1).  James Roe, MD, was the Program Director.  (Id. ¶ 2).

Plaintiff testified at her deposition that Roe began making sexual advances towards her "as soon as [she] started the residency," by "constantly following" Plaintiff and "chasing [her] everywhere in the residency."  (Id. ¶ 9).  She also testified that Roe held her hand twice at the beginning of her residency, and that she responded by pulling her hand away and leaving the room.  (Id. ¶ 11).  Plaintiff testified that she noticed Roe become erect sometime in 2011 while he was reading radiology studies with her, though he did not make any advances towards her at that time.  (Id. ¶ 12).  She also testified that, at some unspecified time, Roe told her that he loved her and that he told her two months into her residency that he would "do everything to be with [her]."  (Id. ¶¶ 13–14).  Plaintiff testified that at unspecified times, Roe invited her on various trips with him, including to the opera, the Pocono Mountains, and to go shooting together.  (Id. ¶¶ 15, 17, 20).  She also testified that Roe asked Plaintiff to move to Michigan with him, told Plaintiff he wanted to have children with her, and asked her what kind of wedding ring she would want from him.  (Id. ¶¶ 16–18).  Plaintiff claims that Roe subjected her to "physical sexual abuse," including "heavy touching and other stuff."  (Id. ¶ 21).  Specifically, she testified that Roe touched her breast once, sometime after February 25, 2013.  (Id. ¶ 24).  Plaintiff also testified that, at some point, she had "some feeling" for Roe.  (Id. ¶ 34).

Although she says that she told him to "stop the harassment every day during [her] residency," Plaintiff testified that she did not complain to Roe himself before April or May of 2012 (at least nine months into the residency).  (Id. ¶ 26).  Plaintiff also contends that she told Meggan

Drake, the Residency Program Coordinator (id. ¶ 8), about Roe's sexual advances from the beginning of her residency, although she cannot specifically identify when she made those reports. (Id. ¶¶ 28–29). She testified she also complained about Roe's conduct to David Mayer, MD, Chair of the Radiology Department (id. ¶ 4), in 2012, but does not recall the specifics of that complaint. (Id. ¶ 30). Plaintiff has not produced any testimony by Mayer.

Defendant largely contests that the above facts are true, but admits that Plaintiff testified as such.

## A.    Documented Communications Between Plaintiff and Roe and Follow-Up

On October 6, 2011, Plaintiff sent an email to Roe stating: "[e]verbody, [sic] incuding [sic] the attendings and residents, is getting the feeling that there is something between us. I do not think we are able to hide it anymore. This may create a big problem soon, we have to do something." (Id. ¶ 31). Roe testified that he thought the email was a joke and he reported it to Drake, who then set up a meeting with the two. (Id. ¶¶ 32, 35–36). Plaintiff explained that she sent the email because she did not want rumors going around that could hurt her residency. (Id. ¶ 39). Plaintiff admits that when she was asked if Roe or any other members of the Radiology Department made any inappropriate comments to her, she answered "no." (Id. ¶ 42). Plaintiff ultimately apologized to Roe for sending the email. (Id. ¶ 43).

Roe then had a follow-up meeting with Drake; Arnold Eiser, MD, Vice-President of Medical Education (Id. ¶ 5); and Pamela Fierro, Administrative Director of Graduate Medical Education (id. ¶ 6). (Id. ¶ 45). When asked, Roe reported that there was nothing going on between himself and Plaintiff. (Id. ¶ 46). Fierro, Drake, and Eiser thus believed that Plaintiff "imagined the issue." (Id.).

In November 2011, Plaintiff sent Roe the following text messages while the two were in Chicago at a conference:

- November 27, 2011: "Would you like to meet me at my motel?"

- November 29, 2011: "I do understand, I will support and follow you. But [I] will just wait for 3 years. At the end of 3 years, you will see . . ."

- November 30, 2011: "If you want to punish me for loving you, do it, it can not hurt more after seeing your eyes."

- November 30, 2011: "I am humiliated enough for being an unwanted position and will never be there again."

(Id. ¶¶ 48–49). She admitted that she had romantic feelings for Roe at the time she sent those messages. (Id. ¶ 51).[4] On November 27, 2011, Roe reported the first of these messages to Eiser. (SUMF ¶ 53). After consultation among Roe, Eiser, and the Chief Medical Officers at Mercy Philadelphia Hospital and Mercy Fitzgerald Hospital, Fierro was directed to forward the text messages and October 6, 2011 email to Defendant's Human Resources Department. (Id. ¶ 56). Roe then met with John Cigler, Director of Human Resources, and Catherine Byrne, Chief Human Resources Officer. (Id. ¶ 57). When asked if there was an inappropriate relationship between Plaintiff and Roe, he responded "no." (Id. ¶ 58).

Plaintiff met with Cigler and Byrne on December 7, 2011. (Id. ¶ 60). She told them that Roe's "sexual advances w[ere] creating an unhelpful environment for [her] training." (Id. ¶ 63).

Following the December 7, 2011 meeting with Human Resources, Plaintiff was referred to Carebridge, Defendant's Employee Assistance Program ("EAP"), through which she met with a

---

[4] The parties dispute whether Roe responded to the text messages. Roe testified that he did not, but Plaintiff avers in her declaration that he apologized and told her he loved her. (SUMF ¶ 52; Resp. to SUMF ¶ 52).

doctor three times. (<u>Id.</u> ¶¶ 67–68). The topics discussed at the sessions were confidential. (<u>Id.</u> ¶ 75). Roe did not receive any reports regarding Plaintiff's participation in EAP (<u>id.</u> ¶ 77), and Cigler merely received a report that Plaintiff "completed all scheduled sessions and has stated her commitment to honor the professional standards required by the residency program." (<u>Id.</u> ¶ 76).

From December 2011 until approximately February 2013, Plaintiff was scheduled to work with Stanley Chan, MD, Associate Program Director, rather than with Roe. (<u>Id.</u> ¶ 78). During that time, Plaintiff testified that she complained to Chan "a lot," but provided no further specifics. (<u>Id.</u> ¶ 79).

**B.      Plaintiff's Performance During Her Residency**

Chan testified that Plaintiff had several performance issues that negatively affected her residency. For example, he noted that Plaintiff's imaging reports contained typographical errors and required editing by attending physicians. (<u>Id.</u> ¶ 80). Chan further testified that attending physicians complained that Plaintiff's reports did not incorporate feedback they had previously given her, and that Plaintiff generally was opposed to receiving negative feedback. (<u>Id.</u> ¶¶ 81, 84–87). Chan noted that, ten months into her residency, Plaintiff became disruptive and interruptive during teaching conferences. (<u>Id.</u> ¶ 83).[5]

A six-month evaluation of Plaintiff's performance dated March 8, 2012 rated Plaintiff as "[e]xcellent" in the majority of categories for which she was evaluated. (Pl.'s SUMF ¶ 62; Resp. to Pl.'s SUMF ¶ 62; Pl.'s Ex. B at MCMC 255–56). The March 8, 2012 evaluation also rated Plaintiff as "[a]dequate" in "Documentation Compliance" and noted that Plaintiff "will work on

---

[5]      To the extent Plaintiff denies these statements, her denials contain no record support. Rather, Plaintiff explains that she was not placed on a performance improvement plan for poor work product. (<u>See</u> Resp. to SUMF ¶¶ 80–87). This fact, if true, does not dispute Chan's testimony.

proofread[ing]." (Pl.'s Ex. B at MCMC 255–56). The evaluation was signed by Plaintiff and Chan. (Id. at MCMC 256).

A six-month evaluation of Plaintiff's performance dated September 11, 2012 rated Plaintiff as "[a]dequate" in the majority of categories for which she was evaluated. (Pl.'s SUMF ¶ 64; Resp. to Pl.'s SUMF ¶ 64; Pl.'s Ex. B. at MCMC 257–58). The September 11, 2012 evaluation also rated Plaintiff as "[i]nadequate" in "Interpersonal and Communication Skills" and noted that Plaintiff needed to "improve [her] reports" and "improve proofreading." (Pl.'s Ex. B at MCMC 257–58). The evaluation was signed by Plaintiff, Roe, and Chan. (Id.; see also Pl.'s SUMF ¶ 66; Resp. to Pl.'s SUMF ¶ 66).

## C.     Roe's Letter of Recommendation

In January 2013, Plaintiff asked Roe and Chan to provide her with letters of recommendation for a neuroradiology fellowship she was applying to at John's Hopkins University. (SUMF ¶ 92). Nafi Aygun, MD, Neuroradiology Fellowship Program Director at Johns Hopkins, had already agreed to accept Plaintiff into the fellowship program. (Id. ¶ 93). After receiving letters of recommendation from both Roe and Chan, Aygun followed up with Roe because, in Aygun's opinion, "there was certain information missing . . . regarding Plaintiff's clinical abilities." (Id. ¶ 95). Although Roe did not tell Aygun that Plaintiff was a poor candidate, and rather reiterated the recommendation given in his letter, Aygun got the impression that Plaintiff's clinical performance was "subpar." (Id. ¶¶ 98–100). Still, Aygun did not find that impression "alarming," and called Plaintiff on February 23, 2013 to congratulate her on receiving the fellowship and reaffirm Aygun's commitment that Plaintiff receive a spot in the fellowship program. (Id. ¶ 102).

Plaintiff nevertheless perceived that Roe had given Aygun a negative recommendation and proceeded to call Roe about it. (Id. ¶¶ 103–04).[6] Plaintiff testified that Roe told her that he did so to teach her a lesson, and he then hung up the telephone. (SUMF ¶ 104). Plaintiff then attempted to call Roe back multiple times. (Id. ¶ 108–10). Roe reported the calls to Eiser on February 23, 2013. (Id. ¶ 111). The parties largely dispute whether they spoke to each other on these calls and what was said. (Id. ¶¶ 105–07, 113–14; Resp. to SUMF ¶¶ 105–07, 113–14). Plaintiff also sent Roe numerous emails on February 23 and 24, 2013, admitting that Aygun was committed to giving her the fellowship. (SUMF ¶¶ 115–17).

On February 25, 2013, Plaintiff confronted Roe at the hospital regarding the letters of recommendation.[7] (SUMF ¶ 118). Plaintiff appeared disheveled and agitated, and Roe told her that he would meet with her later in the day. (Id. ¶¶ 119–20). Plaintiff refused to leave and testified at her deposition that she told Roe she had post traumatic stress disorder. (Id. ¶ 120; Resp. to SUMF ¶ 120). Plaintiff eventually also told Roe that she was in no shape to provide patient care that day because she had not slept or eaten in two days. (SUMF ¶ 122). She then called Eiser and reported the same, which prompted Eiser to schedule a meeting with Plaintiff, Roe, Chan, and Fierro later that morning. (Id. ¶¶ 124–126). At the meeting, Plaintiff reiterated her belief that Chan and Roe's letters damaged her career, despite Eiser's assurance that he had read the letters himself and found them complimentary. (Id. ¶¶ 127–29).

---

[6]     To support the contention that Roe gave Aygun a negative recommendation, Plaintiff relies solely on certain paragraphs of her Declaration that consist of hearsay and omit any record citations. (Pl.'s SUMF ¶¶ 76–77).

[7]     Plaintiff explained at her deposition that she was waiting for Drake to arrive to request a meeting when Roe approached her. (See Resp. to SUMF ¶¶ 118–19). She testified that she "told him to stop harassing" her. (Id.; Pl.'s 9/25/18 Dep. 171:24-172:1).

## D. The Remediation Plan

Eiser scheduled Plaintiff for a psychological evaluation later that day, and informed her that she would not be able to continue in the program until completing it. (Id. ¶ 130). After some resistance, Plaintiff agreed to undergo the evaluation. (Id. ¶¶ 131–34; Resp. to SUMF ¶ 134).

Eiser, Chan, Roe, and Fierro then documented Plaintiff's "extreme lack of professionalism," which is "not a trait that can be condoned in a medical trainee," as well as her "disregard for ongoing feedback," which showed "overall a general lack of personal insight." (SUMF ¶ 135). The four reviewed the letters of recommendation and concluded that they were positive, and also documented that any similar incidents on Plaintiff's part would result in probation, suspension, or dismissal. (Id. ¶¶ 136–37).

Plaintiff's recollection of the meeting differed from that written documentation. (Id. ¶ 138). Although she testified at her deposition that she could not recall what was going on during the meeting, she also testified that the meeting was "mainly about [her] complaints about [Roe's] sexual harassment"—specifically that Roe "was constantly erected whenever [she] was around"—and that Roe "did everything [regarding the letters of recommendation] because of . . . his sexual advances." (Id. ¶¶ 138–40).

Plaintiff completed her psychological evaluation and was cleared to return to work on February 27, 2013. (Id. ¶ 144). Eiser, Roe, and Chan agreed that she could only return subject to a remediation plan that acknowledged how Plaintiff had violated the program's core competencies and provided that any further unprofessional behavior would result in suspension. (Id. ¶¶ 145–48). Plaintiff initially refused to sign the remediation plan and was given until March 4, 2013 to reconsider her decision. (Id. ¶¶ 157, 159). Plaintiff later admitted in emails that she had a problem

with her "professional insight during her residency" and ultimately signed the remediation plan. (Id. ¶¶ 161, 163).

### E. Plaintiff's Suspension & Termination

Later in 2013, Plaintiff agreed to help another resident in the radiology program with a medical paper. (Id. ¶ 167). When Roe learned of this, he asked the other resident not to involve Plaintiff because she had already undertaken a great deal of research and should instead focus on her clinical practice. (Id. ¶ 171). The resident agreed to remove Plaintiff's name as an author of the paper because he believed she had not yet made substantive contributions. (Id. ¶¶ 170, 172).

On April 10, 2013, after the resident informed Plaintiff that her name had been removed from the paper, she loudly confronted Roe about "ruining [her] future" while he was on a phone call with another doctor. (Id. ¶¶ 174–76; Def.'s Ex. 9 at MCMC 224–25). Roe asked her to report to Drake's office, but Plaintiff refused. (SUMF ¶ 179).[8] After further argument, Plaintiff announced her intent to change residencies and signed a blank piece of paper meant to indicate such. (SUMF ¶¶ 180–82; Resp. to SUMF ¶¶ 180–82).

Roe then met with Eiser and Fierro to discuss this confrontation. (SUMF ¶ 185). At some point, Plaintiff appeared outside their meeting room and asked to speak with Roe. (Id. ¶¶ 187–91). She then left the premises but returned when Fierro called her and invited her to attend the meeting. (Id. ¶¶ 196–99). Plaintiff admits that she again confronted Roe "in a loud and hostile manner" about removing her name from the medical paper, although she also admitted that she made no contribution to it. (Id. ¶¶ 200–01, 204). Eiser and Roe advised her that her behavior was unprofessional and asked if she intended to resign from the program. (Id. ¶¶ 206–07). Plaintiff

---

[8]  Plaintiff contests this fact and says instead that she "wanted to meet with Roe to discuss the issue." (Resp. to SUMF ¶ 179). In support of this position, Plaintiff cites portions of her Declaration that contain no record citations.

responded that she would just like to finish her residency, at which time she was informed that she was suspended.  (Id. ¶¶ 207–08).[9]  Roe testified that the suspension decision was premised entirely on Plaintiff's unprofessional conduct, and not on any problems with Plaintiff's performance in the residency program.  (Pl.'s SUMF ¶ 114).

Defendant then sent Plaintiff a letter explaining that she was suspended for unprofessional and inappropriate conduct.  (SUMF ¶ 212).  Plaintiff proceeded to send Roe and Fierro multiple emails, many of which accepted responsibility and apologized for her behavior.  (Id. ¶¶ 213–14).  Plaintiff contends, though, that her apologies and admissions of wrongdoing were meant simply to appease Roe in order to remain in the residency program.  (Resp. to SUMF ¶¶ 214, 216).

At the time of her suspension, Plaintiff's residency was governed by a Resident Physician Agreement (the "Agreement"), which incorporated a Resident Grievance Policy (the "Grievance Policy").  (Pl.'s SUMF ¶¶ 12, 14, 18).  The Agreement specified that a resident "shall be accorded due process" if the Agreement were to be terminated early (Id. ¶ 23), and the Grievance Policy specified that its purpose was "to provide Residents with a fair due process mechanism."  (Id. ¶ 24).  On April 12, 2013, Plaintiff appealed her suspension pursuant to that policy.  (SUMF ¶ 218).

_____

[9]    Defendant maintains that Eiser, Fierro, and Roe jointly decided earlier in the meeting that Plaintiff should be suspended if she chose not to resign.  (SUMF ¶¶ 192, 194).  Defendant contends that Roe did not have the power to unilaterally suspend a resident without Eiser's approval (id. ¶ 193), and that Eiser and Roe both informed Plaintiff that she was suspended.  (Id. ¶ 208).  Plaintiff argues that Roe "unilaterally" informed her that she was suspended.  (Resp. to SUMF ¶¶ 192–94, 195, 208).  With the exception of who exactly informed Plaintiff of the suspension decision, the Court does not find that Plaintiff's position materially contradicts Defendant's on the question as to who was involved in the suspension decision or when it took place.

Plaintiff further contends that she was given an opportunity to apologize, and that she did so.  (Resp. to SUMF ¶ 208).  The parties dispute whether her suspension was made conditional on her willingness to apologize or not.  (Id.; see also Pl.'s SUMF ¶¶ 107–11; Resp. to Pl.'s SUMF ¶¶ 107–11).

At some point, Roe and Eiser decided to change the suspension to a termination, which Plaintiff testified she learned about on a phone call with Fierro on April 12. (Id. ¶¶ 219, 220; Resp. to SUMF ¶ 217; see also Pl.'s 9/25/18 Dep. 233:3-235:11, 239:20-240:6). Plaintiff now contests that she was aware of the termination decision during that phone call, and instead argues that she and Fierro discussed her suspension only. (Resp. to SUMF ¶ 220). Plaintiff does not cite any record evidence to explain this inconsistency. She does cite documents that were entered into the record at oral argument, which show Fierro's contemporaneous documentation of multiple phone calls with Plaintiff on April 10 and April 12, 2013. (Id. (citing MCMC 247–48)). Those documents only reference a discussion of Plaintiff's suspension. (MCMC 248). From a phone call initiated by Fierro at or before 12:40 P.M., Fierro recorded that she "explained to [Plaintiff] that part of this suspension was consideration of whether employment will continue." After a follow-up phone call initiated by Plaintiff at or before 3:38 P.M., Fierro recorded that Plaintiff inquired about whether suspensions are reported to certain credentialing authorities. (Id.).

Plaintiff then received a termination letter on April 19, 2013, which outlined the specific incidents that led to Defendant's termination decision, including Plaintiff's unprofessional emails in October and November 2011, her expressions of anger over the perceived negative recommendation to Aygun, her conduct in confronting Roe in the hospital and at meetings, her behavior after being placed on the remediation plan, and the quality of her imaging reports. (Id. ¶ 222). The letter explained that Plaintiff was terminated due to "repeated disregard of professionalism standards" and "repeated failure to incorporate faculty feedback into [her] clinical

practice." (SUMF ¶¶ 221–23).  Plaintiff was informed that a hearing had been scheduled for April 24, 2014, in response to her appeal of the initial suspension.  (SUMF ¶ 224).[10]

On April 19, 2013, upon receiving the termination letter, Plaintiff emailed several of her program supervisors admitting that her behavior was wrong and that she made mistakes.  (SUMF ¶¶ 227–29).  Plaintiff now explains that she did so because she was trying to appease Roe and his colleagues.  (Resp. to SUMF ¶¶ 227–29).  She also called Carebridge, Defendant's EAP provider, on April 23, 2013, admitting that she acted "in anger" on two occasions and that she did not realize how her stress was impacting her interactions with Roe.  (SUMF ¶ 230; Resp. to SUMF ¶ 230).

### F.    Plaintiff's April 24, 2013 Appeal Hearing

Plaintiff attended the appeal hearing for her termination on April 24, 2013, although she contests that the hearing complied with "fair" due process and the Grievance Policy.  (SUMF ¶ 231; Resp. to SUMF ¶ 231).  At the hearing, Roe himself asked questions of witnesses and presented information regarding Plaintiff's conduct and the subsequent termination decision.  (SUMF ¶ 232).[11]  The exact substance of testimony at the hearing is contested by the parties.  (SUMF ¶¶ 233, 235; Resp. to SUMF ¶¶ 233, 235; Pl's SUMF ¶¶ 115, 148–51; Resp. to Pl.'s SUMF ¶¶ 115, 148–51).  It is unclear from the record and the parties' Statements of Fact, to the extent

---

[10]    Plaintiff argues that this hearing schedule was improper under the applicable Resident Grievance Policy because she initially requested a hearing for her suspension and was not given any further time to prepare once learning that her residency was terminated.  (Resp. to SUMF ¶ 224).  By Plaintiff's own contention, though, the Resident Grievance Policy requires that the Review Committee "[c]onvene the hearing *within* ten (10) days of the Resident's written request." (Id. (emphasis added)).  The five-day turnaround time from Plaintiff receiving the termination letter to Plaintiff's hearing was within that prescribed window.

[11]    Plaintiff contends that Defendant was supposed to give her notice of Roe's role in the hearing, and that Defendant failed to do so.  (Pl.'s SUMF ¶¶ 141–42).  Plaintiff omits any record citations to support these contentions, and Defendant cites the Grievance Policy, which specifically states that the Program Director (in this case, Roe) or his designee "shall be present at the hearing and may present relevant information or materials (oral or written)" in support of his position.  (Resp. to Pl.'s SUMF ¶ 142 (citing Pl.'s Ex. B at MCMC 126 § II.B.5.a)).

they are supported by record citations, exactly who sat on the Hearing Committee and what testimony and evidence was presented. It appears undisputed that the Hearing Committee was comprised solely of members of the Radiology Department. (Pl.'s SUMF ¶ 157; Resp. to Pl.'s SUMF ¶ 157). Eiser was not present for the hearing, and while Fierro took notes, she only did so for the portions of the hearing she was present for. (Pl.'s SUMF ¶¶ 151–55; Resp. to Pl.'s SUMF ¶¶ 151–52). The parties also do not dispute that Cigler told the hearing committee that he had investigated a 2011 complaint of sexual harassment made by Plaintiff and found no evidence to support it. (SUMF ¶ 236). Plaintiff also submitted a written statement to the committee in advance of the hearing, and she did not reference any sexual harassment or retaliation on Defendant's part in that statement. (Id. ¶¶ 237–38).[12] Instead, she acknowledged that she "did many wrong actions. . . . [and] showed behaviors that were not appropriate." (SUMF ¶ 239). She further apologized and promised not to engage in such behavior again. (Id. ¶ 240).

The hearing committee affirmed the termination decision. (Id. ¶ 242). Plaintiff testified that Eiser then informed her that it would be better for her to resign than be terminated so that she could possibly apply to another residency program, and that any further appeal would be useless. (Pl.'s SUMF ¶¶ 118–19, 163–64). Plaintiff chose to resign, and Defendant accepted her resignation on May 1, 2013. (Id.).

Following the termination of her residency, Plaintiff sent an email to Fierro (but addressed the email to Roe and Eiser) "accepting all of [her] unprofessional behaviors to [Roe]" and asking for forgiveness. (SUMF ¶ 243).

---

[12]    Again, Plaintiff explains that she was merely trying to appease Roe in omitting references to the sexual harassment. (Resp. to SUMF ¶ 238).

After resigning, Plaintiff tried unsuccessfully to apply to another residency program to finish her medical education.  (Pl.'s SUMF ¶¶ 120–21).  On May 2, 2013, Roe prepared a Summative Memorandum confirming that Plaintiff had resigned from the residency program.  (Id. ¶ 167).  The Summative Memorandum specifically referred to Plaintiff's suspension.  (Id.).  Roe also sent a letter to the Commonwealth of Pennsylvania State Board of Medicine confirming that Plaintiff had resigned from the residency program.  (Id. ¶ 169).  The letter also specifically referred to Plaintiff's suspension.  (Id.).  Roe then sent a similar letter on September 2, 2014, to the Credentialing Specialist at SourceOne CVO, LLC, confirming that Plaintiff had resigned from the residency program.  (Id. at 170).  The Letter did not reference Plaintiff's prior suspension or remediation plan.  (Id.).

## III.   LEGAL STANDARD

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.  After

the moving party has met its initial burden, the adverse party's response must, by "citing to particular parts of materials in the record," set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1)(A); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986) (The nonmoving party "must do more than simply show that there is some metaphysical dispute as to the material facts"). Summary judgment is appropriate if the adverse party fails to rebut the motion by making a factual showing "sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. <u>Anderson</u>, 477 U.S. at 255.

## IV.    DISCUSSION

### A.    Statute of Limitations

The Third Circuit has applied a two-year limitations period to retaliation and *quid pro quo* claims brought under Title IX. <u>See</u> <u>Mercy Catholic Med. Ctr.</u>, 850 F.3d at 564, 566. Therefore, in its decision on the motion to dismiss in this case, the Third Circuit explained that Plaintiff could premise her claims on "conduct that occurred on or after April 20, 2013, two years before she filed this lawsuit." <u>Id.</u> at 564. The only alleged incidents that met this temporal criteria in the TAC were Plaintiff's termination by letter dated April 20, 2013, and Roe's advocating for her dismissal at the appeal hearing on April 24, 2013. <u>Id.</u>

Discovery has revealed that Plaintiff received her termination letter on April 19, 2013. Plaintiff also testified at her deposition that she first learned of the termination decision on a phone call with Fierro on April 12, 2013. On this basis, Defendant argues that the retaliation and *quid pro quo* claims based on the termination are barred by the statute of limitations. Defendant further argues that Plaintiff cannot rely on evidence related to the termination hearing to revive her time

barred claims because, "where a plaintiff is not required to exhaust [her] administrative remedies prior to bringing suit in federal court, the statute of limitations is not tolled when the plaintiff chooses to seek those optional remedies." O'Shea v. Interboro Sch. Dist., No. 13-06305, 2014 WL 1673237, at *5 (E.D. Pa. Apr. 28, 2014) (Baylson, J.).

In response, Plaintiff argues that she did not really learn of the termination decision until April 19, 2013. Because April 19, 2015 fell on a Sunday, Plaintiff explains that she was within the statutory window when she filed this lawsuit on April 20, 2015. See Fed. R. Civ. P. 6(a)(1)(C). Plaintiff also argues that the following actionable conduct took place after April 19, 2013: the "sham" termination hearing on April 24, 2013; Eiser's insistence that Plaintiff resign on May 1, 2013 instead of pursuing further appeals; and the "false and misleading" letters Roe sent to the State Board of Medicine and other credentialing authorities as late as September 2014. (Opp'n at 15–16).

A limitations period generally begins to run when a plaintiff's cause of action accrues. Mitchell v. MG Indus., Inc., 822 F. Supp. 2d 490, 495 (E.D. Pa. 2011) (Sánchez, J.) (discussing statutes of limitation in an ADEA context). "The accrual date is not necessarily the date on which the wrong that injures the potential claimant occurs, but the date on which the potential claimant discovers he or she has been injured." Id. This articulation of the "discovery rule" usually functions to delay the initial running of the statutory limitations period in employment discrimination cases. Id. Here, Defendant cites it for the proposition that Plaintiff's claims began to accrue earlier in time.

Plaintiff very clearly testified at her deposition that she learned that the suspension decision was changed to a termination decision through a phone call with Fierro on April 12, 2013. (See SUMF ¶ 220; Pl.'s 9/25/18 Dep. 233:3-235:11, 239:20-240:6). She now contends that she did not

learn of the termination decision until she received her termination letter on April 19, 2013, but offers no record support or persuasive argument to explain why she is contradicting her deposition testimony. (See Resp. to SUMF ¶ 220). Plaintiff argues that there is no evidence that Roe or Eiser made the termination decision on or prior to April 12, 2013. (See id.; see also Opp'n at 15; Sur-Reply at 5–6). But the absence of evidence about when the termination decision was made does not refute Plaintiff's clear testimony that she learned about the decision from Fierro on April 12, 2013.

Plaintiff also cites documents, entered into the record for the first time at oral argument, that show Fierro's contemporaneous documentation of multiple phone calls with Plaintiff on April 12, 2013. (See MCMC 247–48). In those documents, Fierro recorded only that she discussed the suspension decision with Plaintiff—there is no reference to any discussion of the termination decision. Fierro did record that she "explained to [Plaintiff] that part of this suspension was consideration of whether employment will continue" in a phone call Fierro initiated at or before 12:40 P.M. (Id. at MCMC 248). She also recorded in a follow-up phone call, initiated by Plaintiff at or before 3:38 P.M., that Plaintiff inquired about whether suspensions are reported to certain credentialing authorities. (Id.). These documents raise a dispute of material fact because they imply that Plaintiff and Fierro only discussed the suspension decision during the April 12 phone call. Even if these documents were insufficient to create a dispute of material fact, the Court will not conclude as a matter of law that the phone call, which was initiated for some other purpose, was enough to put Plaintiff on notice of the termination decision. The decision to terminate Plaintiff's residency was admittedly made by Eiser and Roe, and it is unclear what part Fierro played in that decision or what authority she had to communicate that decision to Plaintiff.

The Court is not aware of, and the parties have not cited to, any relevant, precedential Third Circuit case law addressing what types of communications constitute sufficient notice of termination for this statute-of-limitations analysis. In <u>Bailey v. United Airlines</u>, 279 F.3d 194 (3d Cir. 2002) (not cited by either party), the Third Circuit considered a somewhat similar set of facts when analyzing the proper accrual window for a discharged employee to file a charge with the Equal Employment Opportunity Commission. The plaintiff officially learned of his employment termination in a meeting with two supervisors, but the defendant argued that the plaintiff had actually learned of the decision two days earlier when he received a phone call from a supervisor asking him to come to the meeting to discuss the termination. <u>Id.</u> at 199. The plaintiff denied that the termination decision itself was conveyed over the phone. <u>Id.</u> The Third Circuit explained that "[a]n employer establishes its official position when it decides, unconditionally, to terminate an individual's employment and provides the employee with notice of the unconditional decision to terminate his or her employment." <u>Id.</u> "The charge-filing period begins to run only when the employee receives unequivocal notice of the adverse employment decision." <u>Id.</u> (internal citation and quotation marks omitted). Because there was a dispute of fact as to whether the plaintiff actually learned of the termination decision on the phone call, the Third Circuit held that the statute of limitations could not be definitively decided on summary judgment.

To the extent <u>Bailey</u> applies here, this Court cannot say, as a matter of law, that the April 12 phone call with Fierro provided Plaintiff with unequivocal notice that her suspension had been converted to a termination. This is particularly true because contemporaneous documentation of the April 12 phone call does not reference a discussion of the termination decision at all. Even if it did, it is unclear that the phone call with Fierro would be a satisfactory type of communication to commence the running of the limitations period. There is thus a question of material fact as to whether Plaintiff was put on notice of the decision to terminate her residency prior to April 19, 2013. The Court will not apply the statute of limitations on summary judgment to bar Plaintiff's claims related to the decision to terminate her residency.

Defendant also argues that conduct related to Plaintiff's termination hearing cannot revive her time barred claims because her decision to pursue optional grievance procedures does not toll the statute of limitations for the termination decision. <u>See</u> <u>Delaware State College v. Ricks</u>, 449 U.S. 250, 506 (1980) ("[T]he pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods."); <u>O'Shea</u>, 2014 WL 1673237, at *5 ("[W]here a plaintiff is not required to exhaust their administrative remedies prior to bringing suit in federal court, the statute of limitations is not tolled when the plaintiff chooses to seek those optional remedies."). Indeed, a "grievance procedure . . . is a *remedy* for a prior decision, not an opportunity to *influence* that decision before it is made." <u>Ricks</u>, 449 U.S. at 506 (emphasis in original). But Plaintiff is not arguing that the termination hearing should toll the limitations period as it applies to claims based on her termination. Rather, Plaintiff is arguing that what went on at the hearing itself constituted adverse conduct. The Court addresses below whether such a claim is cognizable. For purposes of this statute-of-limitations inquiry, claims premised on conduct that took place at Plaintiff's termination hearing on April 24, 2013 are not time barred.

The same is true for claims premised on Eiser's supposed interference with Plaintiff's ability to appeal the termination decision and any letters Roe sent regarding Plaintiff after April 20, 2013.

### B.     Retaliation (Count II)

To establish a *prima facie* case of retaliation under Title IX, Plaintiff must show that: (1) she engaged in activity protected by Title IX; (2) she suffered an adverse action; and (3) there was a causal connection between the two. Mercy Catholic Med. Ctr., 850 F.3d at 564. Upon making this showing, the burden shifts to Defendant to advance a legitimate, nonretaliatory reason for its conduct. Id. If Defendant advances such a reason, Plaintiff must then show that Defendant's proffered explanation was false and that retaliation was the real reason for the adverse action against her. Id.

### 1.     Plaintiff's *Prima Facie* Case

For purposes of this Motion, Defendant concedes that Plaintiff engaged in protected activity during the April 10, 2013 meeting and that her termination from the residency program constituted a materially adverse action. Mot. at 17. However, Defendant challenges that Plaintiff has satisfied her burden of showing the third prong of her *prima facie* retaliation case because, according to Defendant, Plaintiff has proffered no evidence of a causal connection between the two. Id. To establish a causal connection, Plaintiff "must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Moore v. Temple Univ., No. 13-5079, 2016 WL 4061352, at *6 (E.D. Pa. July 29, 2016) (Goldberg, J.) (citation omitted), aff'd, 674 F. App'x 239 (3d Cir. 2017). Where the timing between a plaintiff's protected activity and the adverse action is not unusually suggestive, "[t]emporal proximity by itself is generally insufficient to establish a causal connection." Youssef v. Anvil Int'l, 595 F. Supp. 2d 547, 563

(E.D. Pa. 2009) (Baylson, J.); <u>see also</u> <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 280 (3d Cir. 2000) (citing <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 500 (3d Cir. 1997)).[13]  In such a situation, the causal link can be inferred from the temporal proximity and "[a defendant's] 'pattern of antagonism' or retaliatory animus, [defendant's] inconsistent reasons for the [adverse] action, inconsistencies in the defendant's testimony, the defendant's conduct toward others, and the record as a whole."  <u>Youssef</u>, 595 F. Supp. 2d at 563 (citing <u>Farrell</u>, 206 F.3d at 280–81).

Plaintiff has put forth enough evidence to support her *prima facie* case on the termination decision.  Although temporal proximity alone is not usually sufficient to establish a causal connection, the decision to change Plaintiff's discipline from a suspension to a termination occurred, at latest, on April 19, 2013, just nine days after Plaintiff engaged in protected activity. Defendant argues that the decision to suspend Plaintiff was actually made before she engaged in protected activity on April 10, but that says nothing of when the decision to terminate Plaintiff was made.  The fact that Defendant waited until after the meeting on April 10 to change the discipline from suspension to termination, and the fact that Defendant made that change unilaterally and within nine days of Plaintiff's protected activity, weighs in favor of finding a causal connection

---

[13]     Because the Third Circuit has noted that Title VII's retaliation framework "generally governs" Title IX retaliation claims, <u>see</u> <u>Mercy Catholic Med. Ctr.</u>, 850 F.3d at 564, the Court finds Title VII case law applicable to this analysis.

between the two.[14]  Plaintiff also puts forth evidence of an inconsistency in Defendant's reasoning for terminating her residency.  Specifically, the decision to suspend Plaintiff was premised entirely on her violation of the remediation plan in connection with her unprofessional behavior.  The termination letter was premised on that same unprofessional behavior but also cited, for the first time, the poor quality of Plaintiff's work product.  This could constitute an inconsistency in Defendant's story.  Plaintiff has thus put forth sufficient evidence to satisfy her burden of showing a *prima facie* case of retaliation based on the termination of her residency.

Plaintiff also argues that the following conduct constituted adverse actions for her retaliation claim:  (1) conduct that took place at the April 24, 2013 appeal hearing; (2) Eiser's interference with her desire to pursue further appeals; and (3) Roe's subsequent letters to certain credentialing authorities regarding Plaintiff.

Plaintiff argues that the conduct that took place at her April 24, 2013 appeal hearing violated some contractually-owed due process.  But this is a Title IX retaliation claim, not a contract or due process claim.  When prompted at oral argument, Plaintiff could not cite any case law addressing whether a biased appeal hearing constitutes an adverse action for a retaliation claim.  An adverse action in the Title VII context, by comparison, is one that "a reasonable employee would have found . . . 'materially adverse' in that [it] 'well might have dissuaded a

---

[14]     The temporal proximity would be even closer if a jury were to determine that the termination decision was made on or before April 12, 2013, as Defendant argues for statute-of-limitations purposes.  See, e.g., Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (finding a *prima facie* case of retaliation based on plaintiff's discharge two days after employer's notice of his EEOC claim).  Such a determination would not necessarily be inconsistent with the statute-of-limitations analysis above.  That analysis hinges on disputes of material fact about when Plaintiff *learned* of the termination decision and whether the April 12 phone call with Fierro was sufficient to communicate the termination decision to Plaintiff.  On this record, it is possible to conclude that the decision to terminate Plaintiff was made within 48 hours of her protected activity, even if that the termination decision was not unequivocally communicated to Plaintiff until April 19.  Such a factual conclusion could support an inference of causation for Plaintiff's *prima facie* case.

reasonable worker from making or supporting a charge of discrimination.'" Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)). Plaintiff complains that the hearing was biased, but cites no evidence to suggest that it proceeded differently than it might have in any other case. She also cites no evidence that it proceeded differently than it would have if she had not engaged in protected activity on April 10. Moreover, she submitted a statement to the hearing panel accepting responsibility for the charged misconduct and made a statement at the hearing to that same end. Thus, there is no evidence that the events that went on at the hearing might have dissuaded a reasonable resident from complaining about sexual harassment, such as to make them "materially adverse" for her retaliation claim.

Plaintiff also argues that Eiser subjected Plaintiff to an adverse action by encouraging her to resign instead of pursuing further appeals of her termination decision. But Plaintiff's own deposition testimony shows that Eiser did so because "it would be better for her to resign than be terminated so that she could possibly apply to another residency program." (Pl.'s SUMF ¶¶ 118–19; Resp. to Pl.'s SUMF ¶¶ 118–19). This type of advice cannot constitute an adverse action on Defendant's part, and Plaintiff's characterization of that advice as an "inducement" to forgo further appeals is a legal conclusion that is unsupported by the factual record.

Regarding the letters to certain credentialing authorities advising them that Plaintiff had been suspended and then resigned from the residency program, the Court agrees with Defendant that Plaintiff cannot rely on them now when she did not allege that they were a source of injury in her complaint. See Amboy Bancorporation v. Bank Advisory Grp., Inc., 432 F. App'x 102, 111 (3d Cir. 2011) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). Even if she could rely on them, Plaintiff presents

no factual evidence that the letters injured her or that they were causally connected to any protected activity on her part.

The Court is therefore satisfied that Plaintiff has established a *prima facie* case of retaliation, but only so far as that claim is premised on the termination of her residency.

### 2.     Defendant's Legitimate, Nonretaliatory Reason and Pretext

Upon Plaintiff's successful showing of a *prima facie* case, the burden shifts to Defendant to articulate a legitimate, nonretaliatory reason for its decision to terminate Plaintiff's residency. Here, Defendant's legitimate, nonretaliatory reason is that Plaintiff engaged in unprofessional conduct and violated the terms of her remediation plan. (Mot. at 23). Plaintiff does not dispute that this reason satisfies the second prong of the McDonnell Douglas burden shifting test.

The burden then shifts back to Plaintiff to show that Defendant's proffered reason is merely pretextual. To do so, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's] proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (quoting Ezold v. Wolf, Block, Schorr & Solis–Cohen, 983 F.2d 509, 531 (3d Cir. 1992)) (emphasis in original). To avoid summary judgment, Plaintiff's evidence must allow a factfinder to reasonably infer that Defendant's proffered reasoning "was either a *post hoc* fabrication or otherwise did not actually motivate the [adverse] action." Id.

Defendant argues that Plaintiff cannot show pretext because Plaintiff repeatedly admitted that she engaged in the conduct that led to her termination. This position is very well supported by the factual record, although Plaintiff has at times argued that she only apologized or took responsibility because she thought that it would help her maintain her residency. Nevertheless,

the record contains numerous examples of Plaintiff admitting to engaging in the unprofessional conduct at issue and accepting responsibility for the charged actions.

Plaintiff's Opposition wholly fails to address this argument or otherwise contend that the record supports a finding of pretext. It is devoted entirely to Plaintiff's *prima facie* case. Plaintiff addresses pretext for the first time in her Sur-Reply, where she merely argues that inconsistencies in her performance reviews "establish[] a genuine issue of material fact regarding . . . whether Defendant Mercy's purported legitimate, non-discriminatory reasons for the termination was a pretext." (Sur-Reply at 5). When prompted at oral argument to cite Plaintiff's best precedential case on pretext, Plaintiff's counsel cited Farrell, 206 F.3d 271, for the proposition that evidence used to establish a *prima facie* case of discrimination "is often helpful in the pretext stage." Id. at 286. If Plaintiff wished to rely on evidence from her *prima facie* case to rebut Defendant's legitimate reason for terminating her residency, she failed to articulate that in any meaningful way.

It is further unclear how Plaintiff's evidence of temporal proximity and inconsistent reasoning would be responsive to Defendant's contention that Plaintiff admitted to engaging in unprofessional conduct. By Plaintiff's own admissions, there is no evidence that Defendant's explanation for the termination of her residency was a *post hoc* explanation or otherwise fabricated. See Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 647–48 (3d Cir. 2015) (affirming finding that plaintiff had not shown pretext, in part because she admitted to the disciplined conduct and therefore could not show that the defendant's "reason for discipline [was] so weak as to render it 'unworthy of credence'"); Williams v. Pennsylvania Hosp. of Univ. of Pennsylvania Health Sys., No. CV 17-2413, 2018 WL 4491337, at *14 (E.D. Pa. Sept. 18, 2018) (Baylson, J.) (finding that plaintiff had not shown pretext to overcome an employer's nondiscriminatory reason for terminating her employment because the plaintiff's poor

performance was well documented in the record and "[p]laintiff herself admitted to some of the conduct underlying the disciplinary write-ups she received"); Kopko v. Lehigh Valley Health Network, No. 14-1290, 2016 WL 6442062 (E.D. Pa. Oct. 31, 2016) (Stengel, J.) (concluding that the plaintiff failed to show that defendant's reason for termination was a pretext for age discrimination, "especially" because the plaintiff "admitted to every single one of [the defendant's] allegations of wrongdoing").

The Court thus finds that Plaintiff has not met her burden of showing pretext. Judgment will be entered for Defendant on Count II.

### C. *Quid Pro Quo* Sexual Harassment (Count III)

#### 1. Plaintiff's *Prima Facie* Case

To succeed on a Title IX sexual harassment claim under a theory of *quid pro quo* sexual harassment, a plaintiff must show: (1) *quid pro quo* sexual harassment; (2) actual notice to an "appropriate person" who has the authority to institute corrective measures; and (3) a response to the harassment that amounts to deliberate indifference. Bennett v. Pa. Hosp. Sch. of Nurse Anesthesia, No. 01-CV-4098, 2002 WL 32341792, at *3 (E.D. Pa. Oct. 29, 2002) (Kauffman, J.) (citing Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 291–92 (1998)); see also Mercy Catholic Med. Ctr., 850 F.3d at 565–66. To satisfy the initial prong of demonstrating *quid pro quo* sexual harassment, the plaintiff must show that she belongs to a protected group, was subject to unwelcome sexual harassment, and that a tangible educational or employment action resulted from her refusal to submit to sexual demands. Bennett, 2002 WL 32341792, at *3. In its decision on the motion to dismiss in this case, the Third Circuit further explained that "unwelcome sexual advances, requests for sexual favors, or other verbal or physical actions of a sexual nature constitute *quid pro quo* harassment when (A) the plaintiff's submission to that conduct is made

either explicitly or implicitly a term or condition of her education or employment experience in a federally-funded education program, or (B) submission to or rejection of that conduct is used as the basis for education or employment decisions that affect the plaintiff." Mercy Catholic Med. Ctr., 850 F.3d at 565.

Regarding Plaintiff's *prima facie* case, Defendant is only contesting that Plaintiff can show that the termination of her residency resulted from her refusal to submit to any alleged sexual demands. (Mot. at 8). Plaintiff's burden to show this element is similar to her burden to show the causation element in her retaliation claim. Farrell, 206 F.3d at 283. Indeed, Plaintiff may rely on a broad array of evidence to show that her refusal to submit to sexual demands was "used as a basis" for Defendant's termination decision. Id. at 283–84. To establish causation, Plaintiff may point to evidence of hostility or repeated demands for sexual favors, evidence that Defendant gave inconsistent reasons for termination, and evidence of close timing between Plaintiff's response and the termination of her residency. See Pergine v. Penmark Management Co., Inc., 314 F. Supp. 2d 486, 492 (E.D. Pa. 2004) (Robreno, J.) (citing Farrell, 206 F.3d at 282–85); see also Ogilvie v. N. Valley EMS, Inc., No. CIV.A.07-485, 2008 WL 4761717, at *8 (E.D. Pa. Oct. 29, 2008) (Baylson, J.).

Unlike with her retaliation claim, Plaintiff has not put forth evidence of an unusually suggestive time period between her response to Roe's alleged sexual demands and Defendant's termination decision. Plaintiff's testimony paints a picture of ongoing sexual advances beginning in 2011 and spanning the course of her residency. However, the record contains scarce factual details about most of those advances, including their timing and Plaintiff's responses to them. Many of the sexual advances that Plaintiff testified about with specificity took place towards the beginning of her residency, although she testified that, most recently, Roe touched her breast at

some unknown time after a February 25, 2013 meeting. Defendant did not decide to terminate Plaintiff's residency until sometime between April 10 and April 19, 2013. This vague time period is not so close as to be unusually suggestive. Although the Court noted an inconsistency above in Defendant's reasoning for the suspension and termination decisions, that inconsistency on its own does little to support a potential causal link between Plaintiff's response to Roe's alleged advances, which took place at some unspecified time before the inconsistency arose, and the subsequent termination of her residency. On this record, a reasonable jury could not infer causation as required to establish Plaintiff's *prima facie* case of *quid pro quo* sexual harassment.

### 2. Defendant's Legitimate, Nondiscriminatory Reason and Pretext

As with Plaintiff's retaliation claim, "Title VII's *quid pro quo* framework generally governs Title IX claims alleging *quid pro quo* harassment." Id. The Third Circuit has left open the question of whether the burden-shifting framework of McDonnell Douglas applies in the context of Title VII *quid pro quo* sexual harassment claims. See Moody v. Atl. City Bd. of Educ., 870 F.3d 206, 213 n.11 (3d Cir. 2017) (citing Farrell, 206 F.3d 271, 286 n.11 (3d Cir. 2000)). By extension, it remains unsettled whether that framework should apply to Plaintiff's *quid pro quo* claim brought under Title IX.

In Farrell, the Third Circuit accepted the district court's application of burden-shifting in a *quid pro quo* case where the parties did not contest it and where the appellant simply argued that the district court erred in analyzing her *prima facie* case. Farrell, 206 F.3d at 286 n.11. The Court also noted a prior case that applied the burden-shifting framework to affirm a district court ruling on a Title VII *quid pro quo* claim. Id. (citing Craig v. Y & Y Snacks, 721 F.2d 77, 78–80 (3d Cir. 1983)). Since Farrell, the undersigned has applied the burden-shifting framework to *quid pro quo* claims. See, e.g., Ogilvie, 2008 WL 4761717, at *8. Moreover, Plaintiff does not contest

Defendant's contention that the <u>McDonnell Douglas</u> framework applies with equal force to her *quid pro quo* claim. Any burden-shifting analysis the Court would undertake pursuant to <u>McDonell Douglas</u> would result in the same outcome as the Court's analysis for Plaintiff's retaliation claim. Plaintiff has not made any showing that Defendant's reasons for terminating her residency were pretextual, and in fact has admitted to and accepted responsibility for the conduct that underlies Defendant's proffered reasoning. Nevertheless, because the Court has determined that Plaintiff cannot establish her *prima facie* case of *quid pro quo* sexual harassment, we need not definitively apply or rule on the final two prongs of the <u>McDonnell Douglas</u> burden-shifting test here. Judgment will be entered for Defendant on Count III.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF 100) is **GRANTED**, and the case will be dismissed.

An appropriate Order follows.

O:\CIVIL 15\15-2085 doe v. mercy catholic\ 15cv2085 Memo re MSJ